**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **REASON FOUNDATION**, |
| Plaintiff, |
| v. |
| **FEDERAL BUREAU OF PRISONS**, *et al.*, |
| Defendants. |

Case No. 23-cv-0440 (CRC)

## MEMORANDUM OPINION AND ORDER

Federal Bureau of Prisons ("BOP") staff prepare internal reports—known as mortality reviews—whenever an inmate dies in custody to document and assess the medical care the inmate received.  In 2020, Plaintiff Reason Foundation submitted a Freedom of Information Act ("FOIA") request to BOP for reviews from two facilities.  The agency produced several reports in response to the request but redacted portions of them pursuant to several FOIA exemptions.  Reason Foundation now contests the agency's Exemption 5 redactions, and both parties have moved for summary judgment as to the propriety of those withholdings.  The Court finds that the agency properly withheld most—but not all—of the challenged material and will therefore grant both parties' motions in part and deny them in part.  The Court will, however, withhold judgment as to one class of withholdings because it lacks sufficient information to determine whether Exemption 5 applies.

## I.    Background

In May 2020, Reason Foundation, publisher of the magazine *Reason*, submitted a FOIA request to BOP for "any 'mortality reviews' conducted regarding inmate deaths at [Federal Medical Center] Carswell between Jan. 1, 2014 and May 4, 2020" and "any 'mortality reviews'

conducted regarding inmate deaths at [Federal Correctional Institution] Aliceville" for the same period.  Declaration of Kara Christenson ("Christenson Decl."), Ex. B at 1.

Under BOP policy, institutions must conduct a "mortality review" when an inmate dies in custody unless legally authorized by execution.  BOP Program Statement 6013.01 § 11 (2005) (available at Supplemental Declaration of Kara Christenson ("Supp. Christenson Decl."), Ex. A). As part of this process, each institution's "Mortality Review Committee," whose membership varies based on the institution's mission and sometimes includes BOP medical staff, interviews staff, reviews the patient's medical records, and gathers the facts surrounding his or her death. Id. § 11(b).  The committee is tasked with "evaluat[ing] both individual and system performance immediately proximate to the death" and "in the days or months preceding the death."  Id. §§ 11(b)(3)–(4); see also id. § 11(b) (The committee must "identify[] for individuals and systems their respective strengths and weaknesses for the clinical care immediately surrounding the death, and the quality of care for at least six months preceding the death[.]").  The committee then prepares a "Multi-Level Mortality Review Report" ("MLMR" or "mortality review"), which is a standard form with sections asking for a narrative summary of the events leading to the patient's death and the committee's assessment of the patient's care.  Id. § 11(c); see also Defs.' Mot. Summ. J., Ex. 8.

In March 2022, BOP produced mortality reviews in response to Reason Foundation's FMC Carswell request, releasing 84 pages in full and 204 in part.  Christenson Decl. ¶ 11.  The agency took longer to respond to the FCI Aliceville request but, after Reason Foundation filed

this lawsuit, produced 23 pages in full and 39 in part.  Id. ¶¶ 16–17.[1]  The agency withheld

portions of the reviews pursuant to FOIA Exemptions 5, 6, and 7(C).  Id. ¶¶ 11, 17.

Reason Foundation now challenges just the Exemption 5 redactions.  Pl.'s Mot. Summ. J.

at 1.  Both parties have moved for summary judgment and, to aid the Court's review, have

helpfully agreed to a "representative" sample of four mortality reviews—two from FCI

Aliceville (patients R.O. and D.N.) and two from FMC Carswell (patients A.C. and S.S.).[2]

Christenson Decl. ¶ 19; see also Pl.'s Mot. Summ. J. at 2 (noting that this case is "particularly

suited to exemplars, as all the records in question are in [the] same format" and are "required by

federal policy to be completed in a standard manner"); Defs.' Mot. Summ. J., Exs. 4–7

(exemplars). The parties have also provided the Court with a blank, unredacted version of a

mortality review.  See id., Ex. 8.  Their motions are fully briefed and ripe for review.

## II.   Legal Standard

"Summary judgment is the typical and appropriate vehicle to resolve FOIA disputes."

Citizens for Resp. & Ethics in Wash. v. Dep't of Homeland Sec., 525 F. Supp. 3d 181, 187

(D.D.C. 2021).  When reviewing a motion for summary judgment under FOIA, "the underlying

facts and the inferences to be drawn from them are construed in the light most favorable to the

FOIA requester," and summary judgment is appropriate only after "the agency proves that it has

fully discharged its FOIA obligations."  White Coat Waste Project v. Dep't of Veterans Affs.,

404 F. Supp. 3d 87, 95 (D.D.C. 2019) (cleaned up).  "[T]he burden of proof is always on the

---

[1]  Reason Foundation sued both BOP and the Department of Justice ("DOJ"), Office of Information Policy, which handles FOIA litigation for DOJ components, including BOP.  See Defs.' Mot. Summ. J. at 1 n.1; see also 28 C.F.R. §§ 0.24, 16.8.

[2]  To respect the privacy of the individuals named in the reports, the Court refers to them only by their initials.

agency to demonstrate that it has fully discharged its obligations under the FOIA." McKinley v.

FDIC, 756 F. Supp. 2d 105, 111 (D.D.C. 2010).

## III.  Analysis

As noted, the parties dispute the propriety of BOP's Exemption 5 withholdings.  That

issue can be broken down into four questions:  (1) Does Exemption 5, and specifically the

deliberative-process privilege, apply to the redacted content in the mortality reviews, (2) did

BOP waive the privilege for any of those withholdings, (3) did the agency demonstrate

foreseeable harm from releasing the withholdings, and (4) did it disclose all reasonably

segregable parts of the mortality reviews?  The answer to each question is yes—with the caveat

that, as for the second question, BOP waived the privilege for a small subset of withholdings.

The Court will address each question in turn.

### A.  Application of Exemption 5

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would

not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. §

552(b)(5).  Under this exemption, an agency is permitted to assert "the privileges that the

[g]overnment could assert in civil litigation against a private litigant," including "the deliberative

process privilege."  Nat'l Sec. Archive v. CIA, 752 F.3d 460, 462 (D.C. Cir. 2014).  The

deliberative process privilege is aimed at "enhanc[ing] the quality of agency decisions" by

ensuring that officials can "communicate candidly among themselves," Dep't of Interior v.

Klamath Water Users Protective Ass'n, 532 U.S. 1, 8–9 (2001) (cleaned up), and covers

"recommendations, draft documents, proposals, suggestions," and the like, Coastal States Gas

Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).  To that end, courts consider

whether records are "predecisional" and "deliberative."  Coastal States Gas Corp., 617 F.2d at

866 (cleaned up).  A record is "predecisional" if "it was generated before the adoption of an

agency policy" and "deliberative" if "it reflects the give-and-take of the consultative process."

Id.  The Court will start by considering whether BOP's withholdings are predecisional and then

turn to the deliberative half of the equation.

### 1. *Predecisional*

Reason Foundation contends that "Mortality Reviews are not used in BOP decision

making, and are thus not predecisional."  Pl.'s Mot. Summ. J. at 7.  Not so.  As Kara

Christenson, a BOP Supervisory Government Information Specialist, explained, the "MLMR is

not the end of the mortality review process."  Supp. Christenson Decl. ¶ 10.  "Rather, it is the

first major step, after which [an] external reviewer will examine" the report and "determine

whether he/she agrees with the report or ha[s] further recommendations."  Id.  "Even after this

step," the agency's "Medical Director is the final authority in determining, based on the medical

opinions collected at the facility, regional, central office, and external consultant levels, if

corrective action is warranted or if care was appropriate."  Id.; see also BOP Program Statement

6013.01 § 10(e).[3]  In other words, the final agency decision here is a determination by a BOP

official of whether the inmate received adequate care and, if not, what should be done about it.

And the mortality review is prepared to assist the official in reaching that ultimate judgment.

Next, Reason Foundation asserts that mortality reviews contribute to BOP decision-

making only when accompanied by a separate document—the Root Cause Analysis ("RCA").

Pl.'s Mot. Summ. J. at 7.  Here, too, Reason Foundation is mistaken.  For some inmate deaths, an

RCA is required no matter the content of the mortality review.  See Office of the Inspector

---

[3]  The Medical Director is the "final health care authority" for BOP and "is responsible
for all health care delivered by [BOP] health care practitioners."  BOP Program Statement
6010.04 § 3(b) (2014), https://perma.cc/2YW4-SVWN.

General, Department of Justice, Evaluation of Issues Surrounding Inmate Deaths in Federal

Bureau of Prisons Institutions, 24-041, at 50 (Feb. 2024) ("[A]n RCA is required in the event of

an unexpected death occurrence that may have been associated with the healthcare provided to

the inmate.").[4]  But, in other instances, BOP completes an RCA only because the mortality

review triggers it.  See id. ("[T]h[e] process [of completing an RCA] varies depending on the

nature of the death, as well as the content of the MLMR and its recommendations," and "not all

inmate deaths and MLMRs will trigger and RCA.").  The content of the mortality review can

also determine the scope of the RCA.  Id. ("[T]he scope of an RCA may be limited to certain

recommendations contained within an MLMR report.").  Thus, as the dynamic between mortality

reviews and RCAs reflects, the mortality reviews constitute an interim step (and an early one) in

BOP's decision-making process.  See Schneider v. U.S. Dep't of Just., 498 F. Supp. 3d 121, 128

(D.D.C. 2020) (finding the deliberative-process privilege applied because the record "initiated

and served as a preliminary step in [the agency's] larger analysis").

Finally, Reason Foundation claims that because some withholdings concern the quality of

outside medical care, rather than treatment provided by BOP, the information concealed by these

redactions can "prompt no conceivable BOP decision."  Pl.'s Mot. Summ. J. at 7–8.  Again,

Reason Foundation misses the mark.  As a general matter, BOP does make decisions concerning

the care inmates receive from outside facilities.  BOP points to one such example involving wait

times for outside appointments.  See Supp. Christenson Decl. ¶ 13, Ex. D at 13 (noting that a

DOJ audit found that inmates often experienced delays in receiving care from outside facilities

and recommending that BOP improve its system for tracking outside appointments).  And, as for

---

[4]  https://perma.cc/7SQA-7JX5.

mortality reviews, Ms. Christenson explained that if a review "determines outside care at the local community hospital was substandard, the BOP can act on it."  Supp. Christenson Decl. ¶ 13.  This representation carries a presumption of good faith, see, e.g., Gellman v. Dep't of Homeland Sec., 525 F. Supp. 3d 1, 6 (D.D.C. 2021), which Reason Foundation has not attempted to rebut.  Thus, contrary to Reason Foundation's contention, mortality reviews can prompt a "conceivable BOP decision" about the care patients receive from outside facilities.[5]

In sum, the mortality reviews are predecisional.

### 2.  Deliberative

Next up is whether the redacted information is deliberative.  Reason Foundation contends that the information is "factual" and therefore falls outside Exemption 5's scope.  Pl.'s Mot. Summ. J. at 9.  The Court disagrees.

"Under the deliberative process privilege, factual information generally must be disclosed, but materials embodying officials' opinions are ordinarily exempt."  Petroleum Info. Corp. v. U.S. Dep't of Interior, 976 F.2d 1429, 1434 (D.C. Cir. 1992).  The D.C. Circuit has counselled that "Exemption 5 disputes can often be resolved by the simple test that factual material must be disclosed but advice and recommendations may be withheld."  Wolfe v. Dep't

---

[5] Even though the reviews may not always prompt a final decision about outside care or another topic, they still qualify as predecisional.  The Supreme Court has explained that "[a] document is not final solely because nothing else follows it."  United States Fish & Wildlife Serv. v. Sierra Club, Inc., 592 U.S. 261, 268 (2021); see also id. (noting that the deliberative-process privilege "distinguishes between predecisional, deliberative documents, which are exempt from disclosure, and documents reflecting a final agency decision and the reasons supporting it, which are not").  "Sometimes a proposal dies on the vine," the Supreme Court observed.  Id.  Therefore "[w]hat matters . . . is not whether a document is last in line, but whether it communicates a policy on which the agency has settled."  Id.  As described, the mortality reviews do not communicate such a policy; that's left to BOP's Medical Director.  See Supp. Christenson Decl. ¶ 10.

of Health & Hum. Servs., 839 F.2d 768, 774 (D.C. Cir. 1988); see also id. ("[T]he fact/opinion

distinction offers a quick, clear, and predictable rule of decision, for most cases." (cleaned up)).

The redacted information reflects the opinions of the Mortality Review Committee.  Take

patient R.O.'s mortality review as an example.  See Pl.'s Mot. Summ. J. at 11 (noting that the

"patterns" in R.O.'s mortality review "hold true for the other three exemplary" reports).  The

exemption 5 withholdings fall into three categories:

> (1) Prompts asking the Mortality Review Committee to describe "any strengths and
>     weaknesses" in the patient's care and offer any "[r]ecommendation(s)";
>
> (2) Questions about whether the patient's care was "appropriate," "timely," or
>     "acceptable" (e.g., "[w]ere diagnostic procedures appropriate and timely," "[w]as
>     treatment appropriate to complication," and was the "[d]ocumentation in [the]
>     medical record . . . within acceptable limits"); and
>
> (3) Queries about "complications" or "[p]roblems" during the patient's treatment (e.g.,
>     "[a]ny complications adversely affecting outcome" and "[p]roblems encountered
>     during medical emergency, e.g., equipment, communications, transportation").

Defs.' Mot. Summ. J., Ex. 4 at 3–6.

The answers to each category are deliberative.  Category one is clearly so; the Mortality

Review Committee's "recommendations" and views on any "strengths and weaknesses" in the

care received fall in the heartland of the deliberative process privilege.  See Coastal States Gas

Corp., 617 F.2d at 866 ("The exemption thus covers recommendations, . . . , proposals,

suggestions, and other subjective documents which reflect the personal opinions of the

writer[.]").  The answers to category two also receive protection as timeliness, appropriateness,

and acceptability are all matters of subjective opinion.[6]  Though category three presents a closer

question, the redactions in that category also fall within Exemption 5's ambit.  As Ms.

Christenson explained, the medical judgments in the reviews "are, by their nature, not black and

white facts."  Supp. Christenson Decl. ¶ 5.  Because "[m]edical care is a reflection of the clinical

judgment of a licensed provider," there will be "meaningful variation" between providers about

what qualifies as a problem or complication.  Id.; see also id. ("So that differing medical

opinions and perspectives can be considered in relation to the same case is the very reason that a

Multidisciplinary Mortality Review Committee is convened.").  The answers to these questions

reflect the opinions and judgment of the members of the Mortality Review Committee.  They are

thus deliberative.

BOP applied one redaction, however, that fits none of these categories.  In the section of

the mortality review about emergency medical care, the form states, "Response to medical

emergency notification timely" and then lists a series of providers: "Physician," "Physician

Assistant," "Nurse Practitioner," "Nurse(s)," Emergency Medical Techs," and "Others."  Defs.'

Mot. Summ. J., Ex. 8 at 5.  Next to the providers are checkboxes for "Yes," "No," or "NA."  Id.

These prompts ask the Mortality Review Committee to evaluate whether the listed providers

---

[6]  BOP redacted the answer to the question:  Was the "[d]ocumentation in [the] medical record reviewed by Mortality Review Committee and found to be within acceptable limits[?]" Defs.' Mot. Summ. J., Ex. 4 at 6.  Though the answer to the first half of this question—whether the committee reviewed the medical record—appears factual, the answer to the second half— whether the committee found the documentation to be within acceptable limits—is deliberative. The mortality review form, however, provides a single set of checkbox answers ("Yes," "No," or "NA") for both halves of the question.  See id., Ex. 8 at 6 (blank version of the mortality review). The factual and deliberative portions are thus "inextricably intertwined," and disclosure of the response to the first half of the question would "inevitably reveal" deliberative material.  In re Sealed Case, 121 F.3d 729, 737 (D.C. Cir. 1997) ("The deliberative process privilege does not . . . protect material that is purely factual, unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations[.]").

"timely" responded to the medical emergency, and—for the reasons described above—the

prompts therefore qualify as deliberative.  But the form does not end there.  Beneath the

providers, the form then states "CPR" and "ACLS List protocol(s) used (if appropriate)" with

checkboxes and, in the case of the ACLS List protocols, blank lines for narrative text.  Id.[7]  BOP

redacted the responses to the CPR field in the mortality reviews, and Reason Foundation now

challenges those redactions.  See Pl.'s Opp'n at 2.

The Court cannot resolve this dispute because it is unclear from the materials provided to

the Court whether the CPR field asks the Mortality Review Committee to state whether CPR was

administered (a factual question) or to evaluate whether the administration of CPR was timely (a

matter of opinion).  The mortality review lends itself to both interpretations, based on the

supporting arguments laid out in the following chart:

| The form asks: Was CPR administered? | The form asks: Was CPR *timely* administered? |
|---|---|
| On the blank version of the form, there is a gap between the list of providers and CPR, suggesting that the CPR-prompt is separate from the question about the timeliness of the providers' responses.  Defs.' Mot. Summ. J., Ex. 8 at 5. | On A.C.'s form, there is no gap between the list of medical providers and the CPR field.  Defs.' Mot. Summ. J., Ex. 6 at 4.  Furthermore, a colon follows both the timeliness question (listed above the CPR field) and the ACLS List question (listed below the CPR field), suggesting that the CPR field is part of the timeliness prompt and the ACLS List question marks the beginning of a separate question.  Id. |
| CPR (a kind of treatment) is more akin to ACLS-List protocols (kinds of treatment) than it is to medical providers, and the ACLS-List prompt asks whether those protocols were used—not whether they were timely administered. | If the form were asking whether CPR was used (as opposed to timely administered), the CPR prompt would use the phrasing of the ACLS-List prompt but does not. |

---

[7]  ACLS stands for "Advanced Cardiovascular Life Support."

Due to this uncertainty, as well as the absence of a full airing of the competing interpretations in the briefing, the prudent course is to allow the parties an opportunity to work this issue out themselves. Failing that, BOP may renew its motion for summary judgment on this issue with the aid of a supporting declaration explaining how it interprets the CPR prompt.

B.  Waiver

Having determined that BOP's claimed redactions qualify as deliberative (save for the CPR field), the Court must next consider whether BOP waived the privilege over some of those redactions. The "'voluntary disclosure of privileged material . . . waives the [deliberative process] privilege . . . for the document or information specifically released.'" Elec. Frontier Found. v. U.S. Dep't of Just., 890 F. Supp. 2d 35, 46 (D.D.C. 2012) (quoting In re Sealed Case, 121 F.3d at 741). Though Reason Foundation does not employ the language of waiver, its briefs suggest that BOP waived the privilege in several places. The Court finds BOP did effect a waiver, but over only a subset of the redactions that Reason Foundation challenges.

BOP waived the privilege for redactions to checkbox questions where it disclosed the narrative response to the same question. In two of the exemplar reports, BOP redacted the boxes next to a question but left unredacted a written response to the same question. In R.O.'s mortality review, the agency redacted the checkbox answer to the prompt "Problems encountered during medical emergency, e.g., equipment communications, transportation," but then released the written response to the question: "none." Defs.' Mot. Summ. J., Ex. 4 at 5. Likewise in D.N.'s report, the agency redacted the boxes to the same prompt but then left unredacted the subsequent narrative text: "offsite government vehicle." Id., Ex. 5 at 5. Because BOP voluntarily disclosed the Mortality Review Committee's views of what constituted (or did not

constitute, in R.O.'s case) a "problem[]," it waived the deliberative-process privilege over its checkbox response to that same question.[8]

Reason Foundation's other waiver contention comes up short.  It suggests that BOP waived the privilege for answers that can be "presumed" based on released sections of the reviews.  For example, Reason Foundation notes that D.N.'s review recounts that she refused preventative healthcare and diagnostic treatments.  Pl.'s Opp'n at 2 (citing Defs.' Mot. Summ. J., Ex. 5 at 3).  The agency, however, refused to release the answer to the question, "Were diagnostic procedures appropriate and timely."  Defs.' Mot. Summ. J., Ex. 5 at 3.  Reason Foundation claims this redaction "hid[es] purely factual (and obvious) information."  Pl.'s Opp'n at 3.  As discussed above, the Mortality Review Committee's assessment of whether care is "appropriate and timely" is not purely factual.  Nor does it matter whether the answer seems "obvious" based on BOP's disclosure of related information.  As the D.C. Circuit has explained, though "voluntary disclosure" of attorney-client-privileged material "waives the privilege . . . as to all other communications relating to the same subject matter," "this all-or-nothing approach has not been adopted with regard to . . . the deliberative process privilege."  In re Sealed Case, 121 F.3d 729, 741 (D.C. Cir. 1997).  "Instead, . . . release of a document only waives" the deliberative-process privilege "for the document or information specifically released, and not for related materials."  Id.; see also id. ("This limited approach to waiver . . .  is designed to ensure that agencies do not forego voluntarily disclosing some privileged material out of the fear that by doing so they are exposing other, more sensitive documents.").  In other words, though the

---

[8]  The Court identified the two instances in the exemplar reports where BOP disclosed a narrative response to a question whose checkboxes it redacted.  The Court trusts that the parties will identify any other examples of this pattern in reviews not submitted to the Court and that BOP will produce the withheld information consistent with this opinion.

agency released information about whether D.N. received diagnostic treatment, that disclosure does not waive the privilege for the related—but distinct—issue of whether the Mortality Review Committee viewed her treatment as appropriate and timely.

In sum, the agency waived the privilege over certain redactions but not on the scale Reason Foundation suggests.

C.   Foreseeable Harm

These findings "do[] not end the matter." Reps. Comm. for Freedom of the Press v. FBI, 3 F.4th 350, 370 (D.C. Cir. 2021). Under the FOIA Improvement Act of 2016, the agency must produce privileged materials unless it "reasonably foresees that disclosure would harm an interest protected by" the FOIA exemption. 5 U.S.C. § 552(a)(8)(A)(i)(I). "In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations. A perfunctory state[ment] that disclosure of all the withheld information—regardless of category or substance—would jeopardize the free exchange of information between senior leaders within and outside of the [agency] will not suffice." Reps. Comm., 3 F.4th at 369–70 (cleaned up).

BOP satisfied this requirement. Ms. Christenson explained that the mortality reviews are part of BOP's "peer-review process," whereby BOP staff, who are "ideally . . . not involved in the deceased [patient's] care, [] evaluate actions of those who provided care [and] [] judge whether the provided services were medically acceptable." Supp. Christenson Decl. ¶ 15. "Peer reviews," she continued, "rely on confidentiality to protect professional relationships and team dynamics." Id. And "[t]he potential" that peer reviewers' opinions might be "made public [would] deter BOP employees from acknowledging mistakes in the future" and would therefore

"significantly impact the [agency's] healthcare delivery model."  Supp. Christenson Decl. ¶¶ 15,

18.  With this explanation, BOP has offered the necessary "focused and concrete demonstration

of why disclosure of the particular type of material at issue will, in the specific context of the

agency action at issue, actually impede those same agency deliberations going forward."  Reps.

Comm., 3 F.4th at 370.

Reason Foundation raises several objections, but none succeeds.  First, it views the

agency's explanation as insufficient, claiming it ignores the subject of the redactions and

addresses instead the harm that would result from releasing identifying information about

medical providers.  Pl.'s Opp'n at 4 ("[N]one of the questioned redactions reveal anything []

about the individual providers involved in the deceased's care.").  To be sure, Ms. Christenson

does address this kind of harm.  See Supp. Christenson Decl. ¶ 14 ("Medical staff . . . have been

singled out, reported inappropriately to state licensure boards, and received inappropriate

communications . . . .").  But that is not the only harm she outlines.  She explains that "[q]uality

improvement processes (such as the MLMR) can be used as a vehicle to criticize" or "ridicule"

"the agency."  Id. ¶ 16.  And, as described above, she notes that the members of the Mortality

Review Committee would be "deter[red] . . . from acknowledging mistakes" if they feared those

mistakes would be publicized.  Id. ¶ 18.

Second, Reason Foundation suggests that BOP should be required to remove the

Exemption 5 redactions because similar reviews are "regularly released in federal litigation with

private contractors" or local agencies and were released on one occasion by Immigration and

Customs Enforcement ("ICE").  Pl.'s Opp'n at 4.  But none of the cases with private contractors

or local agencies involved FOIA claims or the deliberative-process privilege.  See Agster v.

Maricopa Cnty., 422 F.3d 836, 839 (9th Cir. 2005) (about the absence of a federal common-law

peer-review privilege); <u>Avila v. Mohave Cnty.</u>, No. 3:14-cv-8124 (HRH), 2015 WL 6660187, at

*3 (D. Ariz. Nov. 2, 2015) (same); <u>McNamara v. City of Philadelphia</u>, No. 20-cv-4570, 2022

WL 2356772, at *1 (E.D. Pa. June 30, 2022) (about the Patient Safety Quality Improvement

Act's privilege for patient-safety work product).  And in the ICE case, the agency had offered

"little more than generalized assertions" of foreseeable harm.  <u>Am. Oversight v. Dep't of</u>

<u>Homeland Sec.</u>, 691 F. Supp. 3d 109, 117 (D.D.C. 2023) (the agency contended that releasing

draft mortality reviews and related documents would, among other harms, "confuse the public,"

"discourage the expression of candid opinions," and "result in harm" (cleaned up)).  As

described, BOP's explanation of harm does not suffer from the same flaws and instead is

"specifically focused on the information at issue." <u>Machado Amadis v. Dep't of State</u>, 971 F.3d

364, 371 (D.C. Cir. 2020) (cleaned up).

        Third, Reason Foundation contends that BOP has failed to demonstrate foreseeable harm

because it "points to no harm that has come from" the release of mortality reviews in other cases.

Pl.'s Opp'n at 5.  Such a requirement imposes too high a burden.  The main harm BOP has

articulated—that employees would be deterred from raising concerns or calling out mistakes—is

near impossible to detect.  How could the agency identify that employees were censoring their

opinions in mortality reviews when BOP has no way of knowing those employees' views in the

first instance?  Especially when those employees are not BOP staff but instead work for private

contractors or other agencies.  "[T]he foreseeability requirement means that agencies must

concretely explain how disclosure '*would*' . . . adversely impair internal deliberations." <u>Reps.</u>

<u>Comm.</u>, 3 F.4th at 369 (emphasis added).  But the requirement does not mean the agency must

show that disclosure of similar information *has* resulted in harm, much less when the disclosure

was made by other agencies or non-governmental actors.

D. Segregability

Finally, the Court must address whether BOP released all reasonably segregable material.
FOIA requires that agencies disclose "[a]ny reasonably segregable portion of a record . . . after
deletion of the portions which are exempt" from disclosure.  5 U.S.C. § 552(b).  Reason
Foundation does not question that BOP satisfied this requirement, but, under D.C. Circuit
precedent, district courts "cannot approve withholding exempt documents without making an
express finding on segregability."  Machado Amadis, 971 F.3d at 371 (cleaned up).  Agencies
are, however, "entitled to a presumption that they complied with the obligation to disclose
reasonably segregable material."  Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1117 (D.C.
Cir. 2007).

BOP fulfilled its obligation.  Ms. Christenson averred that she "personally reviewed the
releases in this matter, including the documents partially released, and [] determined that no
documents contain releasable information which could be reasonably segregated from the non-
segregable portions."  Christenson Decl. ¶ 25.  Based on this representation and its own review
of the sample mortality reviews, the Court is satisfied that BOP released reasonably segregable
material.

IV.  **Conclusion**

For the foregoing reasons, it is hereby

**ORDERED** that [ECF No. 10] Defendants' Motion for Summary Judgment is
GRANTED in part and DENIED in part.  It is further

**ORDERED** that [ECF No. 12] Plaintiff's Motion for Summary Judgment is GRANTED
in part and DENIED in part.  It is further

**ORDERED** that the parties shall meet and confer by September 2, 2024 and submit a joint status report by that date informing the Court whether they have resolved the issue concerning the mortality reviews' CPR field.  If not, Defendants shall have until October 2, 2024 to file a renewed motion for summary judgment accompanied by supplemental declaration on that issue.

      **SO ORDERED.**

                                                  _____

                                                  CHRISTOPHER R. COOPER
                                                  United States District Judge

Date:  <u>August 1, 2024</u>